GIBBS *vs.* CLAGETT, *et al.*—*December*, 1829.

The real estate of an intestate was adjudged incapable of division, and elected to be taken at the appraisement per acre, under the act of descents, by one of the heirs, who gave his bonds accordingly, conditioned to pay the co-heirs their several proportions of the appraised value of the land. Such heir, who was also the administrator, in consideration of retaining the amount of the intestate's debts to be paid by him, out of the proceeds of the real estate, delivered over the intestate's personal property to his co-heirs. It was afterwards discovered, that the land fell short of the estimated quantity, on which the appraisement was founded. In this case, a bill in equity, in which all the co-heirs were made defendants, was held to be a proper mode of obtaining relief, as well to rectify the error in the estimate of the land, as to obtain credit for the debts paid; which payments, if they exceed the proceeds of the land, may, as essential to full relief, be recovered back.

Upon the establishment of such a case, it is the duty of the Chancellor to direct the auditor to state an account between the parties; and the order to the auditor should invest him with the usual authority of taking testimony, upon the subject matter of the account.

The objection that a bill is multifarious, should be raised by a demurrer, before answer; filing an answer, and going into an examination of testimony, as to the merits of the whole matter in controversy, is a waiver of that objection.

If a bill be liable to be dismissed for multifariousness, it ought to be dismissed *in toto*, and not made the foundation of partial relief.

An agreement by the distributees of the personal estate, to refund to the administrator the amount paid by him, to the creditors of the deceased, beyond assets, is the subject of a special action on the case at law, not of a bill in equity.

APPEAL from a decree of the Court of Chancery, dismissing the bill of the complainant, (now appellant.)

The case is fully stated in the opinion delivered by this Court.

BLAND, Chancellor, (March Term, 1827.) The late *Thomas Gibbs* died in the year 1811, seized in fee of a parcel of land, which descended to these parties, or his children and heirs; to whom, by his testament, he gave the personal property of which he died possessed. And he left a widow, the mother of these parties. Some time after the death of the father, it was agreed among his widow and children, that the widow should reside on the land during her life or widowhood; and hold it, together with all the personal property of the deceased, during that time; that these defendants should also be permitted to reside on the land during their celibacy; and, that from the whole of the deceased's estate so held together, and from the cultivation of the land, the widow and the defendants should have a maintenance; and the residue of the rents and profits should be applied to the payment of the debts of the testator. The whole estate was held according to this agreement, until the latter part of the year 1815, when the widow died. In the fall of the year following, these parties made a distribution among themselves of the whole of the testator's personal property. The real estate which had descended to them, having been found incapable of division, without loss, this plaintiff, under the sanction of a judicial proceeding, instituted for the purpose of effecting a partition, elected to take the whole; and gave his bond, according to law, for the payment of the shares to which the other heirs were entitled; their sister *Julia* being then alive, but who has since died unmarried, intestate, and without issue. *Elizabeth Clagett*, one of these defendants, brought suit, and obtained judgment against this plaintiff, for the whole amount of her share. After which it appeared, on a re-survey, that the land descended and so taken by the plaintiff, was deficient in quantity.

Upon this state of things this bill was filed.   In the *first* place, the complainant alleges that the land was estimated to contain a greater number of acres than it really did; that his bond, on which *Elizabeth Clagett* had obtained judgment, having been given on this erroneous estimate, he is entitled to an allowance for the deficiency; and therefore, he prays that she may be injoined from suing out execution. This alleged deficiency being admitted by the answer, upon the motion to dissolve the injunction which had issued, a credit was directed to be given on the judgment, for that amount, and the injunction was dissolved as to the residue. This branch of the case is simple and clear.   But then it is confined exclusively to the complainant, and this one defendant, *Elizabeth Clagett,* alone.   It extends no farther; nor can it in any way affect either of the other defendants with any bearing of the injunction, which is the only equity upon which *Elizabeth Clagett* was brought in to answer it.

But it appears from the bill and exhibits, that there are other branches of this case, which are extended indiscriminately or jointly, to all the defendants.   In the *second* place, the plaintiff alleges, that he managed the affairs of these defendants, and took care of their property; and he accordingly claims a compensation for his stewardship. *Thirdly,* he alleges, that he paid the costs of the judicial proceedings for the partition of the land, and the expenses of surveying it.   For these sums he claims reimbursement, as for so much money lent and advanced, to the use of the defendants.   *Fourthly,* he alleges, that it was agreed by these defendants, that he should be allowed out of the money which would be due from him, for the real estate he had elected to take, all sums which he should be entitled to out of his father's personal estate.   And *lastly,* he alleges, that it was agreed he should be allowed, by way of set off for all sums, with which he should be credited by the Orphans' Court, as administrator of his father, and for all claims against his father's estate, which he had paid, or should pay ; that he has paid debts due from his late father, to a much

greater amount than the assets which came to his hands; and therefore, now calls on these defendants to refund.

And for the purpose of obtaining a final decree, covering each of these several branches of his whole case, he prays specifically, that the defendants may account with him in the premises.

It was urged, that this was a proper case for an account; that it could not be correctly understood, and determined, without an account; and that this was the proper stage of the proceeding to ask for a decree to account. If I could be satisfied that this was a case in which the parties were entitled to ask for a decree, to account; or if I could look forward to any relief which I might give on having an account stated, I should not hesitate in sending the case to the auditor, either by a formal decree or a common order, to have an account stated. But I cannot see that the plaintiff would be likely to obtain any benefit from the labours of the auditor.

We are told that the common law action of account has become almost obsolete; because the parties, in all cases where that action would lie, find it more convenient to resort to a court of equity. It is then evident, that in all cases where an action of account might have been brought, the Chancellor may pass a decree to account. By the common law, and the several *English* statutes, all of which are in force here, an action of account may be maintained by any one against his bailiff, or receiver, or any one who may be regarded as such; by one merchant against his partner, or another merchant; and by one joint tenant or tenant in common, against his companion; and also by and against the executor or administrator of such parties. But there is no instance of an action of account being brought by a bailiff, or receiver, *against* his principal; nor could such an action be sustained, from the very nature of things. Now it is clear, that the defendants, in reference to the whole or any branch of this case, cannot be considered, in any respect whatever, either as bailiffs, receivers, merchants, joint ten-

ants, or tenants in common. No action of account could be maintained against them; and consequently they cannot be decreed to account.

But it may be said, that the analogous proceeding in a Court of Chancery, takes a different and a much more comprehensive scope than the common law action of account. It does so, but yet it also has its limits, and is tied down by rules. In a proper case of account in equity, it would seem that both parties are regarded as actors, as reciprocally plaintiff and defendant; since it is certain, that if it should appear from the auditor's report, made in pursuance of a decree to account, that the plaintiff was indebted to the defendant, a final decree might be passed for such balance, in favor of the defendant against the plaintiff. But there could be no such judgment at law, in an action of account, against the plaintiff. In this case the plaintiff specifically prays, that all his claims may be set off against the amount due by him to the defendants, for the land he had elected to take. But it is a settled principle of equity, that a party cannot be permitted to come here merely to obtain the benefit of a set off. If his claims are susceptible of legal proof, and are such as may be set off, his remedy is at law, and not in this court. But in addition to those cases where an action of account would lie at common law, this court can only decree an account where there are mutual demands, and a series of charges on the one side, and a variety of payments on the other; not merely a single payment or receipt; or where the defendant is chargeable as a trustee. And although in most cases where there are mutual demands, an action of *assumpsit* would lie, yet since the subject cannot be so well investigated in such an action, a Court of Chancery will decree an account.

Upon these principles, where an insurance broker by his bill asked for discovery and an account of money paid and received by him on account of the defendant, and money due to him for commission, postage of letters, and upon notes endorsed to him, it was dismissed. And so too,

where a mechanic who had contracted to build a house, after he had performed the work, claimed a balance, giving credit for several partial payments, and brought a bill for an account, it was dismissed. In both these cases it was held, that the remedy at law was complete, and therefore the complainants could not be allowed to bring their cases into a Court of Chancery.

Now in whatever way this case may be considered, either altogether or on any one branch, there are not accounts on each side. The defendants have, each of them, but one claim; and these claims of theirs are not held by them in common, but by each, in severalty. There is but one single transaction; no mutuality of dealings, no variety of accounts. Nor can these defendants be considered for any purpose whatever, as trustees.

On the other hand, there is indeed a sufficient complexity and diversity in the plaintiff's claims. The *first* of them is for an allowance for the deficiency in the quantity of the land he had elected to take; and it is admitted; but it is only a proportional deduction which he is entitled to have from each defendant, individually, not conjointly. It is a claim by the plaintiff, in his own capacity as obligor, against each defendant as obligee. The *second* is for services rendered to all the defendants jointly, in the management of their joint concerns. If it be well founded in fact, it is a mere legal claim, wholly distinct from the preceding, and of an entirely different nature. But it has not a single characteristic trait of equity about it. The *third* is merely for money paid and advanced; and, like the *second,* is properly the subject of an action of *assumpsit.* The *fourth* is one which seems to be founded on a particular agreement; and if so, it is also properly the subject of a special action upon the case at law, not of a bill in equity. The *fifth* and last claim, is in substance, that these defendants or distributees, be decreed to refund; and this plaintiff rests either on the agreement he sets out, or on the common justice of the court. This is one of those demands which fall ex-

clusively within the cognizance of a court of equity, and cannot be enforced at all, in any form of action at law. This claim to refund, when made by a creditor, or by one legatee against another, is always treated with respect, and never rejected without substantial reasons. But when presented by an executor or administrator, as in this instance, it must be alleged, and clearly appear, that the distribution was involuntarily made, or obtained by fraud or mistake, or without any agreement to refund.

Of these several claims of the plaintiff, the *first* presents but one single item between the parties on each side; the *second, third* and *fourth,* present cases like that of the insurance broker, where all the accounts are on the side of the plaintiff, and where there is ample relief at law, according to the plaintiff's own showing. The *fifth* is a case peculiarly proper for a court of equity; but is not a case where the parties would be decreed to account, unless from some special circumstances. Although the court might order an account to be stated, if the case should require to be elucidated by a calculation or statement. There is then nothing in this case to authorise or require a formal decree, or even a common order to account.

But the case stands for a final hearing on bill, answer, general replication, and proofs; and since an interlocutory decree to account cannot be passed, it must now be disposed of by a final decree.

The bill upon its face is multifarious. The five several claims of the plaintiff are not only separate and distinct in themselves, wholly unconnected with each other, but they are essentially different in their extent, nature, and character. The *first* is confined to the single question, what is the amount due from the plaintiff to each defendant. The *second* and *third* are merely legal claims against all the defendants, and are the subjects of actions upon the case at law. The *fourth* is founded on a special agreement, is wholly distinct from the rest; and the proper remedy, if any, is at law. And the *fifth* is a claim which could only

be sustained in this court; is distinct in its nature, and of a character wholly different from all the others. The *first* claim, as against each defendant, it is true, originates from the same source, but the case of no one defendant is necessarily blended with the other. The four last claims have no sort of connexion with each other; but that of these same defendants being the joint party on the one side to them all.

The several component parts of the complainant's case are most unhappily incongruous, or incompatible with each other. One part consists of matter in which the defendants are not necessarily connected; three others belong exclusively to the courts of common law, and the *fifth* presents a case in which the party can only be relieved in a court of equity : these matters are apparent on the face of the bill. It is essential that there should be, to a certain extent, and at least apparently, a consistency and coherency in the several component parts of the plaintiff's case, as set out in his bill. And the entire case, the several parts of which have been so improperly blended, as exhibited by the bill, (notwithstanding it may have been answered,) should appear at the hearing to be of a character to confer jurisdiction on a court of equity. Upon the whole, this bill cannot in any manner be sustained.

Decreed, that the complainant's bill of complaint be dismissed, with costs.

From this decree the complainant appealed to this court.

The cause was argued before Earle, Martin, and Dorsey, J.

*Brewer, Jr.* for the appellant, contended, 1. That the complainant below has no remedy at law; at least no adequate, plain, and simple remedy for the recovery of his demands. That neither of them could be set off at law against his bond to the State for the use of the defendants, either by the common law, under our acts of Assembly, or under the

agreement proved in the cause, nor could an action at law be sustained for the recovery of them; and if they could be recovered at law, it would not afford an adequate, plain, and simple remedy. 6 Bac. Ab. 135. Montague on set off, 68, App. 5. Cox vs. St. Bartholomews Hospital, 8 Ves. jr. 140. Maugham vs. Mason, 1 Ves. jr. 416. Earle vs. Hinton, 2 Stra. 732. Ludlow vs. Simond, 2 Caines Cas. 38. 2. That the complainant's claim to be repaid out of the real estate, what he had overpaid of the personal estate, as representing the creditors so paid; or that the defendants, as distributees, should refund, are both clear matters of equitable jurisdiction. Tyson vs. Hollingsworth, 1 Harr. and Johns. 470. 3. That the complainant's claim to be allowed for the deficiency of the land, is a clear matter of equitable jurisdiction; his right to the allowance being admitted by the answer. 4. That the want of jurisdiction of the court, ought to have been taken advantage of by demurrer, and cannot be taken advantage of at the hearing. Conner vs. Drury, 2 Harr. and Gill, 220. Underhill vs. Van Cortlandt, 2 Johns. Ch. Rep. 369. Ludlow vs. Simond, 2 Caines Cas. 38, 40, 52. Livingston vs. Livingston, 4 Johns. Ch. Rep. 290. Burgess vs. Wheate, 1 Eden's Rep. 190. 5. That the matter of the complainant's claim is not multifarious, but flows from one source, and every item is a part of the res gesta of the same transaction, and is joint against all the defendants. 6. That multifariousness in the bill should be taken advantage of by demurrer, and cannot be objected at the hearing. Berke vs. Harris, Hard. Rep. 337. Ward vs. the Duke of Northumberland, 2 Anstr. 469. 2 Madd. Ch. 234. Mitf. Plead. 147. 7. That the bill should not have been dismissed in toto, some of the claims asserted thereby, being within the jurisdiction of the court.

Shaw, for the appellees. In 1811, the father of the complainant and defendants died intestate, as to his real estate. Letters of administration were granted on his personal

estate to the complainant, who in 1816 admitted that the whole estate was settled, and made distribution among the representatives, of their several portions of the personal estate in specifics. In 1818 he applied for a partition of the real estate, which not being susceptible of division, he elected to take the whole, and gave his bond for paying to the other heirs their proportions of the value of the estate. *Mrs. Clagett*, one of the heirs, recovered judgment for her share. For the first time, in 1824, the complainant, by his bill, claims for having overpaid the estate. He passed no account with the Orphans' Court, until just at the time of filing his bill in this case. He claims for interest on monies paid up to the time of passing his account; also for attending the farm, and for money lent and advanced, &c. Why did he make distribution among the representatives, without informing himself of the debts being all paid? The injunction in this case could only have been granted on the ground of deficiency of the land, the complainant had elected to take. If he had any claim against his sisters, it was recoverable at law against them separately for money paid them, for money overpaid the estate, and for superintending the farm. His counsel admits that his claim was neither a legal nor an equitable set off at law; nor is it in equity. There is no allegation in the bill, of a deficiency of personal assets to pay the debts of the deceased. Another of his claims is for commissions as administrator, which was not allowed by the Orphans' Court. It was for that court, and for no other court, to make the allowance for commissions.

DORSEY, J. delivered the opinion of the court.

The bill states that *Thomas Gibbs*, late of *Anne Arundel*, died seized of a tract of land called *Gibbs' Inheritance*, which the complainant and his sisters, the defendants, inherited in *co-parcenary*. That it was appraised under the act of descents, in virtue of proceedings in *Anne Arundel* County Court, and being adjudged incapable of division, the

complainant elected to take the same at the appraisement, and accordingly gave bond to the State of Maryland, in the penal sum of $3000 ; conditioned for the payment of $612 75, to each of the other heirs for their proportion; the land being valued at $15 per acre, and supposed to contain 204 acres, but that in fact, it contains but 190 acres, as appears by actual survey, since made.   Exhibit A, is referred as a transcript of those proceedings, but it is nowhere to be found in the record before us.   The bill further states, that *Elizabeth Clagett,* one of his sisters, hath brought suit on said bond in *Anne Arundel* County Court, recovered judgment thereon, and levied a *fi. fa.* on the property of the complainant, which is now advertised for sale.   That *Thomas Gibbs* died in 1811, having first made his last will and testament, sufficiently executed and attested to pass his personal, but not his real estate, by which he devised the whole of his real and personal estate to his wife for life, giving to his single daughters a home therein, and after the death of his wife, devising the land to your orator, and imposing on him, during his mother's life, the duty of superintending the whole property for her.   That after the death of *Thomas Gibbs,* the widow and her single daughters, (*Elizabeth Clagett* being the only one who had married, but was then a widow,) continued to reside on, and cultivate said land, with the consent of said *Elizabeth Clagett,* and the complainant, until the father's will was discovered about three years after his death, when it was agreed between all his heirs, that the will should have the same effect it would have had if properly executed, except so far as related to the complainant, and that in pursuance of such agreement, the maiden sisters and mother continued to reside on and cultivate said land, until her death, which happened in the fall of 1815, the complainant superintending the farm during that period. That *Thomas Gibbs* died considerably in debt, and that letters of administration on his estate, were granted to the complainant, on the 9th of August, 1814, who returned an inventory amounting to the sum of $2717 60; and on the 6th

of May, 1816, passed his first account, in which he was credited with $313, the amount of his commission on the inventory and some debts paid. That on the 11th February, 1819, he passed another account, in which he was credited with debts due to himself and others, amounting to the sum of $1515 75½, and that on the 16th of October, 1824, he passed another account, and obtained credit for $1764 65, for claims due by his father's estate, and paid by the administrator, or authorised to be retained by him for his own claims, no part of which credits were paid out of the personal estate of the deceased, although amounting to $876 30½ more than the whole amount thereof. The vouchers for all which claims, are stated to have been filed with the bill, as are also copies of said accounts settled with the Orphans Court. The bill also states, that the complainant had paid other debts of the deceased, which he will make appear, and prays to be allowed for. And that the whole of the personal estate of *Thomas Gibbs* was, in the fall of 1816, distributed between the complainants and defendants, by persons selected for that purpose, with which distribution, all parties at the time professed to be satisfied, and still retain possession of the proportions of property to them respectively allotted. That at the time such distribution was made, it was agreed between the complainant and his sisters, that he should elect to take the land, at the commissioners valuation, and that he should be allowed out of the said valuation, all sums of money, with which he should be credited by the Orphans Court, as administrator of his father, and all sums which he should be entitled to out of his father's personal estate, and all claims against it, which he, as administrator, had paid or should pay. The defendants' by their answer, admit the proceedings in *Anne Arundel* County Court, as regards the land, the election of the complainant to take the same at the valuation, as stated in the bill. They admit also the deficiency in the quantity of the land, and that the complainant shall be entitled to a credit from each of these defendants for the sum of fifty-two dollars

and fifty cents, being the amount of their several proportions of said deficiency. The defendant, *Elizabeth Clagett*, admits the judgment, execution and levying thereof on the property of the complainant. The defendants admit the will of *Thomas Gibbs*, and the time and circumstances attending the execution and discovery thereof, as stated in the bill, and the agreement of all the parties, that during the life time of the mother, the property should be held in the manner directed by the will; but they allege that by that agreement, " for the purpose of saving the personal property from being sold, the crops made on the land, and the whole profits of the real and personal estate, should be applied to the payment of their father's debts." The defendants deny that the complainant, from the time of his father's death, continued to reside on the farm and to cultivate it, or superintend it for the use of their mother, until her death. But they charge that the complainant, during the time, and even prior to the death of their father, rented and cultivated for his own use, another farm at some distance off, and received the whole profits thereof, and that he could not have given the necessary attention to both places, and his only services were to sell the produce of the farm, and to apply the proceeds to the payment of their deceased father's debts. The defendants then " charge that, at the time of their father's death, there was on hand thirteen hogsheads of tobacco, part of the personal estate, which were sold by the complainant, who received the price thereof, but has not accounted for the same." They also state, that in the year of their father's death, there *was* made on the farm three hogsheads of tobacco, one other crop which was sold to *John Claytor*, and two other crops sold to *Richard Estep;* all of which were sold by the complainant, but are not accounted for. They also charge, that the rents and profits of the estate, received by the complainant, if fairly applied, were more than sufficient to pay their father's debts, and they deny that any allowance should be made for the superintendance of the farm. They also state, that the complainant had the

sole use, and received the wages of two sawyers, and one plantation hand, for eight years; and that the complainant, so far from pretending, at the time of the division of the personal estate, that there was not a sufficiency to pay the debts of the deceased, then expressly stated, that the debts were all paid, except one of *William Stewart's,* of forty dollars, and that he had in his hands at that time, a balance of $600, arising from the sales of the tobacco, and that a crop of tobacco was hanging in the house. They further state, that at the time he took from the estate the two sawyers, as aforesaid, he said their wages would pay all the debts; and the defendants deny that any part of the monies arising from the sales, ever was applied to the support of the family, or either of these defendants, but was received and expended by the complainant himself. They positively deny that there ever was, either at the time of the division of the personal estate, or any other time, any agreement or understanding, that the complainant should be allowed out of the valuation of the real estate, any sums of money whatever, for charges and credits which might be allowed him by the Orphans Court, as stated in the bill of complaint.

An injunction having issued as prayed, upon the filing of the bill: on hearing the motion to dissolve the same, after the answer came in, the Chancellor passed an order, that the injunction be "dissolved, except as to the sum of $52 50, for which sum the said *Elizabeth Clagett,* is hereby required and enjoined to give the said *Thomas Gibbs* credit on her judgment.

Upon the return of the commissions with the testimony taken under them, the Chancellor, upon various grounds which are assigned in his decree, and which he alleges are apparent upon the face of the bill, refused to send the case to the auditor to state an account between the parties, and dismissed the complainant's bill.

To the correctness of this refusal and dismissal, we must be permitted to withhold our assent. We cannot discover

in the bill of complaint, that multifariousness, which, in the opinion of the Chancellor, precludes the complainant from all claim to relief.    It was a ground of defence not relied on by the defendants; if it had been, they should not have answered, but have demurred to the bill.    To test the accuracy of this objection, we must view the question as if it arose on such demurrer, and in so doing, we at once divest it of the entire foundation on which, by the reasoning of the Chancellor, it is made to depend.    The bill simply claims a deduction from the purchase money of the land for its deficiency in quantity, the cost of its survey, and the amount of the debts of the deceased settled by the administrator, and allowed by the Orphans Court; and which, by the alleged specific agreement of the parties, were to be so deducted.    These credits all have reference to the same subject matter; the land or price at which it sold; and in the same degree affect the interests of each and all of the defendants.    So far then from viewing them, as the Chancellor appears to have done, as so complex, incongruous, and incompatible with each other, as to vitiate as multifarious, a bill which should unite them, we regard them as so connected and blended together, that had each subject been made the basis of a distinct bill, or had separate bills for the same matters been filed against each of the defendants, a Court of Equity would, on motion, have or deredthem to be consolidated.    To avoid the multiplication of suits and costs in Chancery, such a consolidation would be imperiously demanded.

But suppose it be conceded that the bill is multifarious, and therefore defective; the defendants have waived all exception to the defect, by filing their answer, and going into an examination of testimony, as to the merits of the whole matters in controversy.   To permit them to take advantage of such an objection, at that stage of the proceedings, would be a fraud upon the complainant, and is not reconcileable to the order, liberality, and justice which pervades that system of rules by which Courts of Chancery are governed.

If the bill, however, be liable to dismissal for multifariousness, it ought to be dismissed in *toto*, and not made the foundation of partial relief, as the Chancellor appears to have designed it to be, in ordering a credit to be entered on *Elizabeth Clagett's* judgment, for one-fourth part of the amount of the deficiency in the quantity of land, which order the decree intended to leave in full force. Nor can we perceive the soundness of the discrimination made between the complainant's right to a credit against *Elizabeth Clagett*, and against the other defendants. His equity in both cases rested upon the same admission in the answer; and if it were proper, (as we think it was) to have allowed the credit on the judgment of *Elizabeth Clagett*, an endorsement of a similar credit should have been decreed to be entered upon the bond against the respective claims of *Mary* and *Cassandra Gibbs*.

The facts presented by the record before us, do not, we think, warrant our adoption of the Chancellor's views of most of the claims preferred by the complainant. The first claim, as numbered by him, being for a deficiency in the quantity of land, is admitted to be a fit subject of equitable jurisdiction; but he insists that the claim against each defendant, is separate and distinct, and should be the subject of an independent bill. To this doctrine, the object and effect of which would be an useless multiplication of actions, we cannot subscribe. The deduction sought for being from the whole valuation of the real estate, and not from the proportion of any particular distributee: all who are interested therein, not only may, but ought to be made, parties to the bill.

The second claim, says the Chancellor, is for services rendered all the defendants jointly, in the management of their concerns, and is purely legal, not having one characteristic trait of equity about it. There is nothing in the record in this cause, from which we could infer that the complainant ever urged any such claim as that thus enumerated, as a discount from his bond. The bill certainly

prays for no such relief, nor ought the proof taken on the subject to be regarded, as indicating a design to urge such a claim. The taking of such testimony, appears to have been wholly defensive, and to have been the necessary consequence of the defence set up by the answer, which charged the payment of the debts of the deceased to have been made (by agreement of all the parties concerned) out of the rents and profits of the real estate, and not out of the individual funds of the complainant. To a correct ascertainment of which rents and profits, applicable to that object, proof of the expenses, incident to the cultivation of the land, was indispensable.

For the recovery of the third claim, as it is denominated in the decree, being for the costs of a survey, the facts in the record disclose no remedy to the complainant, either at law, or in equity.

The fourth claim says the decree is founded on a particular agreement, and is the subject of a special action on the case at law, not of a bill in equity. If this had been simply an agreement by the distributees of the personal estate, to refund to the administrator the amount paid by him to the creditors of the deceased, the force of the Chancellor's position could not be evaded. But that is not the case before us. Here there was a special agreement, founded on an adequate consideration, that the amount of all debts of the deceased, paid by the complainant, should be retained by him out of the amount of the valuation of the real estate, of which he should elect to become the purchaser. Upon the faith, and in pursuance of this agreement, the personal estate is delivered over to the defendants. The complainant elects to take the land at its valuation, and pays the debts of the deceased. Ought a Court of Equity, under such circumstances, to stand by and permit the defendants to commit so gross a fraud upon the complainant, as to wrest from his hands the whole of that fund, which they had specifically pledged for the payment of his claims? We think not. The agreement of the parties, as

stated in the bill, and sustained by the testimony, shews that the complainant never consented to rely on the personal responsibility of the defendants, and should not therefore be compelled to resort to it, but that he looked for indemnity and reimbursement to the purchase money of the land, on which he had a clear, equitable lien. Upon payment of debts of the deceased by the administrator, out of his own funds, equal to the whole amount due on the bonds, a Court of Equity should decree its cancellation. Upon payment to a less amount, it should decree that a credit for the same be endorsed upon the bond.

As regards the prayer of the complainant, that in case his claim should overrun the amount due on his bond, the defendants should be decreed to repay him the difference, we consider it reasonable, and that to grant it, is within scope of clear Chancery powers. Having once acquired jurisdiction over the subject matter, by ascertaining the amount due to the complainant, with a view to its deduction from the valuation of the land; the authority to grant full relief, follows as a necessary consequence.

We have gone thus at large in disclosing our views of the grounds on which the Chancellor bottomed his decree, in order to facilitate future proceedings in this cause, which must take place before him. And confining ourselves within those limits, which he professedly prescribed to himself, our remarks have been predicated upon the bill alone, without reference to the answer of the defendants, or the testimony taken under the commissions issued for that purpose. It becomes us now to make a single observation upon the merits of the case, as presented by the record.

The agreement charged in the answer is unsupported by proof, whereas that alleged in the bill of complaint is substantiated by two witnesses, who made the distribution of the personal property, and their testimony is corroborated by pregnant circumstances. We therefore think there is error, not only in the general dismissal of the bill under

the circumstances in which it was made, but that the Chancellor erred in refusing to direct the auditor to state an account, elucidating the matters in controversy between the parties, and thereby presenting the items of litigation more distinctly to the view of the court. The facts in this case render it indispensably necessary, that the order to the auditor should invest him with the usual authority of taking testimony upon the subjects matter of account, which are embraced in his statements.

**DECREE REVERSED.**